999 So.2d 1081 (2009)
Keith O'BRIEN, individually, and as Personal Representative of the Estate of Meghan M. O'Brien, deceased, Appellant,
v.
STATE FARM FIRE & CASUALTY CO., a foreign corporation, and State Farm Mutual Automobile Insurance Company, a foreign corporation, Appellees.
No. 1D08-0175.
District Court of Appeal of Florida, First District.
January 8, 2009.
*1082 Stephen J. Pajcic, III, Paul A. Shorstein, and Benjamin E. Richard of Pajcic & Pajcic, P.A., Jacksonville, for Appellant.
Reed W. Grimm, Brian E. Currie, and Rhonda B. Boggess of Taylor, Day, Currie, Boyd & Johnson, Jacksonville, for Appellees.
BENTON, J.
Keith O'Brien appeals the judgment entered in favor of State Farm Fire & Casualty Co. (State Farm), which held that he had no uninsured or underinsured motorist coverage under his State Farm personal liability umbrella policy because he had rejected such coverage at the time he applied for the policy. Deciding cross motions for summary judgment, the trial court concluded that State Farm had complied with section 627.727(2), Florida Statutes. We affirm.

I.
We review de novo a final summary judgment rejecting a claim of uninsured motorist coverage. See State Farm Mut. Auto. Ins. Co. v. Shaw, 967 So.2d 1011, 1014 n. 2 (Fla. 1st DCA 2007) (citing State Farm Mut. Auto. Ins. Co. v. Parrish, 873 So.2d 547, 549 (Fla. 5th DCA 2004)). The sole issue before us is the legal question whether appellant's rejection of uninsured motorist coverage under an umbrella policy in 1992 precluded recovery under the policy on account of his daughter's death in a 2004 automobile accident. See Smith v. Perry, 635 So.2d 1019, 1020 (Fla. 1st DCA 1994).

II.
The facts are not in dispute. When he purchased the umbrella policy in 1992, Mr. O'Brien owned three automobiles, and the umbrella policy covered two members of his household.[1] Between 1992 and 1997, the annual policy premium increased incrementally from $125 to $264. Effective December 16, 1997, the policy was changed from a Class I to a Class II umbrella policy because a youthful driver was added,[2] increasing the annual premium from $264 to $538. In 1999, the premium decreased to $510 based on a decrease in the number of vehicles from three to two. In 2001, the premium increased to $690 as a result of the addition of a second youthful driver and of a third automobile. In 2003, with the addition of a fourth automobile, the premium increased to $1,265. At all times, the policy provided $1,000,000 in personal liability coverage.
When he purchased the umbrella policy from State Farm on October 16, 1992, Mr. O'Brien signed a form application under the following language:
REJECTION OF UNINSURED/UNDERINSURED MOTOR VEHICLE COVERAGE

*1083 In keeping with the laws of my state, I have been offered the opportunity to purchase Uninsured/Underinsured Motor Vehicle Coverage, and I hereby reject the opportunity to purchase this option as part of this application.
[X] I reject Uninsured/Underinsured Motor Vehicle Coverage on all vehicles.
[] I reject Uninsured/Underinsured Motor Vehicle Coverage on recreational vehicles only.
I understand and agree that this acknowledgement of rejection shall be applicable to the policy applied for, all future renewals of the policy and on all replacement policies, until I make written request to add this coverage.
He never sought to rescind this rejection of uninsured motorist coverage under the umbrella policy and never communicated with State Farm on the subject.
At no time after the initial application did State Farm raise or in any way revisit the question of uninsured or underinsured motorist coverage. In making uninsured motorist coverage available to Mr. O'Brien at the time he applied for the umbrella policy in 1992, State Farm complied with one of its obligations under section 627.727(2) (1991). As he was free to do, Mr. O'Brien expressly rejected uninsured motorist coverage at that time. While the statute also requires the insurer to make such coverage available upon the written request of the insured, see § 627.727(2), Fla. Stat. (2003), there is no dispute that Mr. O'Brien never made such a request in the present case.
On the date of his daughter's death, appellant was a named insured on four State Farm automobile policies, as well as on the umbrella policy. Within three months of the accident, State Farm tendered checks for $400,000, the full amount of uninsured motorist coverage under the (stacked) automobile policies. At issue on appeal is the availability of (up to $1,000,000) of excess coverage under the umbrella policy.

III.
Section 627.727, Florida Statutes,[3] governs the extent to which motor vehicle liability insurance policies delivered or issued for delivery in Florida must make uninsured motor vehicle coverage available. The parties agree that subsection (2) applies to umbrella policies and governs the umbrella policy at issue here. See Weesner v. United Servs. Auto. Ass'n, 711 So.2d 1192, 1193 (Fla. 5th DCA 1998) (holding umbrella policy governed by the provisions of section 627.727(2), but not section 627.727(1)); Tres v. Royal Surplus Lines Ins. Co., 705 So.2d 643, 645 (Fla. 3d DCA 1998) (observing that subsection (1) applies to primary policies and "differs substantially" from subsection (2), which "deals with non-primary policies" such as an umbrella policy).
Under section 627.727(2), an excess insurer's only duty with respect to its offer of uninsured motorist coverage is to "make available as a part of the application for such policy, and at the written request of an insured," uninsured motorist coverage in an amount equal to the bodily injury limits contained in the policy or one million dollars. § 627.727(2), Fla. Stat. (2003); see also Tres, 705 So.2d at 645 (observing that "section 627.727(2) does not contain the same requirements" as section 627.727(1), but instead "only requires an issuer of a non-primary policy to notify an applicant of the availability of UM coverage").
*1084 Subsection (1) governs only those policies "which provide[ ] bodily injury liability coverage ... with respect to any specifically insured or identified motor vehicle registered or principally garaged" in Florida.[4] § 627.727(1), Fla. Stat. (2003). Subsection (1) provides the specific form a written rejection of uninsured motorist coverage (or selection of lower uninsured motorist coverage limits than the bodily injury limits provided in the policy) must take[5] and establishes a conclusive presumption that an insured who signs the form has made "an informed, knowing rejection of coverage or election of lower limits on behalf of all insureds." Id. Subsection (1) also requires the insurer to "notify the named insured at least annually of her or his options as to the coverage required by this section." Id.
Subsection (2) explicitly provides that the requirements of subsection (1) do not apply to non-primary policies. See § 627.727(2), Fla. Stat. (2003) ("[T]he provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state ... do not apply to any policy which does not provide primary liability insurance that includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle.").
Subsection (2) of section 627.727, Florida Statutes, sets forth different requirements for excess policies not providing "primary liability insurance ... coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle." Subsection (2) provides:
(2) The limits of uninsured motorist coverage shall be not less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured. The limits set forth in this subsection, and the provisions of subsection (1) which require uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state, *1085 do not apply to any policy which does not provide primary liability insurance that includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle. However, an insurer issuing such a policy shall make available as a part of the application for such policy, and at the written request of an insured, limits up to the bodily injury liability limits contained in such policy or $1 million, whichever is less.
§ 627.727(2), Fla. Stat. (2003) (emphasis supplied). In Tres, the Third District explained the difference between subsections (1) and (2):
Section 627.727(1) mandates that a primary policy include UM coverage unless an informed, knowing, written rejection of such coverage is made by the insured on the proper form. The purpose of this is "to assure that an insured appreciates the availability of UM coverage and makes a knowledgeable and deliberate decision to accept or reject it." Travelers Ins. Co. v. Quirk, 583 So.2d 1026, 1029 (Fla.1991).
On the other hand, section 627.727(2) does not contain the same requirements. Basically it only requires an issuer of a non-primary policy to notify an applicant of the availability of UM coverage. [Id.].
Tres, 705 So.2d at 645 (footnote omitted). Here State Farm notified Mr. O'Brien that uninsured motorist coverage was available under the umbrella policy. Acknowledging in writing that he had been offered an opportunity to purchase this coverage, Mr. O'Brien rejected the opportunity in writing.

IV.
But he argues that he is entitled to uninsured motorist coverage under the umbrella policy because changes were made to the policy from time to time, including the addition of new "exposures" on account of newly registered or garaged vehicles. He relies particularly on Strochak v. Federal Insurance Co., 717 So.2d 453 (Fla.1998), for the proposition that State Farm was required to renotify him that he could purchase uninsured motorist coverage when, in 2003, he acquired two new vehicles that had not previously been registered in Florida.[6]
In Strochak, a three-justice plurality opinion of the Supreme Court of Florida answered the following certified question from the United States Court of Appeals for the Eleventh Circuit (as restated by the plurality) in the affirmative:
Whether an excess carrier has a duty to make available the uninsured motorists (UM) coverage required by section 627.727(2), Florida Statutes (Supp.1990), to an insured under an existing policy on vehicles which had never been registered or principally garaged in Florida when any vehicle, covered or subsequently added, first becomes registered or principally garaged in Florida and when the policy is delivered or issued for delivery in Florida.
717 So.2d at 454. A concurring justice (while joining the plurality on the choice of law question[7]) made clear that, the insured *1086 having registered an automobile in Florida, the insurer's duty to notify only "arose when the excess policy was first delivered to her in Florida." 717 So.2d at 457 (Wells, J., concurring) (emphasis supplied).
The plurality's affirmative answer to the certified question was thus qualified by limiting it to situations where (as in Strochak) the policy was initially "delivered or issued for delivery in Florida." 717 So.2d at 454. The plurality opinion itself said that "[t]he duty to offer excess UM coverage was created in June 1990, when the excess motor vehicle liability policy was first delivered in Florida and included coverage for the 1984 Lincoln." Id. at 455. Although the certified question in Strochak referred, moreover, to an insurer's duty under an existing excess policy, the plurality concluded that "the 1990 Masterpiece policy that provided excess liability coverage for the 1984 Lincoln was not the same policy that was issued and delivered in New Jersey in 1985," noting that the 1990 policy had been issued to a different named insured, contained a different policy number, and provided different coverage than the 1985 policy.[8]Id. at 455 (emphasis supplied, footnote omitted).
Here we are concerned with the same umbrella policy initially issued in Florida in 1992 to the same named insured, bearing the same policy number and providing *1087 coverage in the same amount. State Farm complied with the requirements of section 627.727(2) by making uninsured motorist coverage available to appellant at the time he applied for the umbrella policy in 1992. See Strochak, 717 So.2d at 457 (Wells, J., concurring) (concluding that the insurer's "duty to notify Rita Strochak of the availability of UM coverage under the excess policy arose when the excess policy was first delivered to her in Florida").

V.
Relying on statutory changes to section 627.727 enacted in 1984, see Ch. 84-41, § 1, at 94-96, Laws of Fla., and on case law interpreting the statute before the 1984 amendments were ever in force, appellant next argues that State Farm was required to make uninsured motorist coverage available every time the umbrella policy was renewed, extended or changed.[9] The argument urges resort to an inclusio unius exclusio alterius theory despite clear statutory language. We hold that unambiguous language in section (2) trumps any and all canons of interpretation, and conclude that the 1984 amendments treat excess policies differently than primary motor vehicle liability policies.
In 1984, the legislature for the first time explicitly exempted policies which do not provide primary liability insurance for specifically insured motor vehicles from the requirements set forth in subsection (1). The legislature amended subsection (2), in relevant part, as follows:
(2) (a) The limits of uninsured motorist coverage shall be not less than the limits of bodily injury liability insurance purchased by the named insured, or such lower limit complying with the rating plan of the company as may be selected by the named insured. The limits set forth in this subsection and the provisions of subsection (1) requiring uninsured motorist coverage to be provided in every motor vehicle policy delivered or issued for delivery in this state, shall not apply to any policy which does not provide primary liability insurance which includes coverage for liabilities arising from the maintenance, operation, or use of a specifically insured motor vehicle. However, the insurer issuing such policies shall make available *1088 as a part of the application, and at the written request of the insured, limits up to the bodily injury liability limits contained in such policies....
Ch. 84-41, § 1, at 95-96, Laws of Fla. The House of Representatives' Final Staff Analysis explains that, as amended, subsection (2) exempts "excess or umbrella-type policies" from the "written rejection" requirements of subsection (1):
The bill limits the applicability of the uninsured motorist requirements to liability policies covering specifically insured or identified motor vehicles.... The bill also limits the applicability of the written rejection and minimum limit requirements to policies providing primary liability coverage for a motor vehicle. Therefore, such requirements would not apply to excess or umbrella-type policies which may cover specific vehicles, but which provide excess coverage over a layer of primary coverage. However, the insurer issuing such excess policies must make available as part of the application and at the written request of the insured, UM limits up to the bodily injury liability limits contained in such policies.
Hooper v. Zurich Ins. Co., 789 So.2d 368, 369-70 (Fla. 2d DCA 2001) (quoting Fla. H.R., CS/HB 319 (1984) Staff Analysis (final June 21, 1984)).
The language in section 627.727(1) relieving an insurer from the obligation to offer an insured the opportunity to reject uninsured motorist coverage for any policy which "extends, changes, supersedes, or replaces an existing policy" as to which the insured had already rejected such coverage was not added to the statute in 1984, when the Legislature amended the statute to exempt non-primary policies from the requirements of subsection (1), but rather in 1980, when the statute did not distinguish between primary and non-primary automobile policies. See Ch. 80-396, § 1, at 1588, Laws of Fla.; see also Coney v. Gen. Ins. Co., 445 So.2d 671, 673 (Fla. 3d DCA 1984). The Legislature's failure, some four years later, to include comparable language in section 627.727(2), which exempts excess insurers from the requirements of subsection (1) altogether and imposes instead an entirely different requirement that such insurers "shall make available as a part of the application for such policy, and at the written request of an insured," uninsured motorist coverage, § 627.727(2), Fla. Stat. (Supp.1984), cannot fairly be read to imply that an excess insurer must offer uninsured motorist coverage under subsection (2) under circumstances that a primary insurer need not. On the contrary, case law interpreting the pre-1980 version of section 627.727(1), Florida Statutes, has no bearing on the application or interpretation of section 627.727(2), Florida Statutes (Supp. 1984). See Weesner, 711 So.2d at 1193 (Fla. 5th DCA 1998) (holding excess policy governed by the provisions of section 627.727(2), not section 627.727(1)); Tres, 705 So.2d at 645 (observing that subsection (1) applies to primary policies and "differs substantially" from subsection (2), which "deals with non-primary policies" such as an umbrella policy).

VI.
Appellant also relies on Fireman's Fund Ins. Co. v. Pohlman, 485 So.2d 418, 420 (Fla.1986), where our supreme court held that an insured entered a "separate and severable contract of insurance" when an automobile policy endorsement added coverage for an additional vehicle after section 627.4132, Florida Statutes, had been amended to permit stacking. The court gave the amended statute effect, there being no unconstitutional impairment of the obligations of contract, and held that the insured, notwithstanding the antistacking provisions in effect when he purchased his *1089 policy, was entitled to stack uninsured motorist coverage on the newly added vehicle. See Pohlman, 485 So.2d at 420-21.
But, as Pohlman itself and as other courts have noted, Pohlman is inapplicable in the context of determining whether the addition of a new vehicle to an existing policy creates a new policy requiring the insurer to offer the insured a new opportunity to reject uninsured motorist coverage pursuant to section 627.727. See Nationwide Mut. Fire Ins. Co. v. Hild, 818 So.2d 714, 717-18 (Fla. 2d DCA 2002) ("While the Pohlman decision did address the issue of UM coverage for a vehicle added to an existing policy, it did so in the context of a statutory amendment that broadened UM coverage for all insureds. The Pohlman court specifically stated that it neither considered nor intended to decide whether the addition of a new vehicle to an existing policy created a `new policy' for purposes of requiring a new UM selection form."); Gasch v. Harris, 808 So.2d 1260, 1261 (Fla. 4th DCA 2002) (holding that Pohlman decision "dealt exclusively with a question of statutory interpretation under section 627.4132, Florida Statutes (1999)[sic], dealing with antistacking provisions and their retroactive applicability" and "directly distinguished it[self] from cases dealing with `explicit rejection of uninsured motorist coverage.'" (quoting Pohlman, 485 So.2d at 420)). See also Pohlman, 485 So.2d at 420 ("We note that those cases dealing with whether an endorsement to an insurance policy constitutes a new insurance policy or the renewal of the original policy for purposes of requiring an explicit rejection of uninsured motorist coverage are not controlling in this instance."). The decision in Pohlman does not support appellant's position here.

VII.
Finally, appellant argues that he is entitled to receive uninsured motorist coverage under the umbrella policy because the written rejection of coverage he signed in 1992 was ambiguous. The form rejection applies to "the policy applied for, all future renewals of the policy[,] and ... all replacement policies," but does not mention policies which "extend[ ], change[ ], [or] supersede[ ]" an existing policy. § 627.727(1), Fla. Stat. (2003). He contends that the rejection form is, at best, ambiguous with respect to whether the rejection applies if the umbrella policy is modified, superseded or changed, but not renewed or replaced. In the alternative, he argues that the rejection form by its terms does not apply to any modification that merely extends, changes, or supersedes the umbrella policy. This argument misconceives the insurer's obligation under subsection (2), which is only to make uninsured motorist coverage "available as a part of the application for such policy, and at the written request of an insured." § 627.727(2), Fla. Stat. (1991).
By making uninsured motorist coverage available to appellant when he initially applied for the umbrella policy in 1992, State Farm fulfilled its first  and what proved to be its only  obligation under section 627.727(2). The failure of the rejection form to track the statutory language of section 627.727(1), Florida Statutes (2003), language which does not apply to excess policies such as the umbrella policy at issue here, does not render the rejection form ambiguous or in any way deficient. Because appellant rejected uninsured motorist coverage and never thereafter requested in writing that uninsured motorist coverage be added to the umbrella policy, the initial, unambiguous rejection of uninsured motorist coverage under the umbrella policy stands.

VIII.
We accept the premise that precise compliance with statutory requirements is necessary *1090 in this area. See Ferreiro v. Philadelphia Indem. Ins. Co., 816 So.2d 140, 141 (Fla. 3d DCA 2002) (recognizing "long, uninterrupted chain of Florida cases which say that the failure of any motor vehicle insurer, specifically including an excess or even an umbrella carrier, to abide by pertinent statutory requirements concerning offers or provisions of UM protection results in its being held to that coverage"). But State Farm complied precisely with the requirements of section 627.727(2) in the present case.
Affirmed.
WOLF and BROWNING, JJ., concur.
NOTES
[1] Although the policy does not insure specifically named vehicles, underwriting does depend on the number of automobile "exposures" for which primary coverage exists.
[2] Deborah Evans, State Farm's corporate representative, explained the difference in the classes:

We actually have four classes for our umbrella line. The first class is our preferred, Class 1 and that's where there's no youthful operators, no accidents or charges and all the underlying coverage is with State Farm. And then our Class 2 is the same as our Class 1 expect [sic] for the existence of a youthful operator.
[3] The statute did not change in any respect material to the present case between the date the policy initially took effect on October 16, 1992, and the date of the accident on March 30, 2004.
[4] Subsection (1) provides, in relevant part:

(1) No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom. However, the coverage required under this section is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy.... Unless an insured ... requests such coverage or requests higher uninsured motorist limits in writing, the coverage or such higher uninsured motorist limits need not be provided in or supplemental to any other policy which renews, extends, changes, supersedes, or replaces an existing policy with the same bodily injury liability limits when an insured ... had rejected the coverage.
§ 627.727(1), Fla. Stat. (2003).
[5] The statute provides:

The rejection or selection of lower limits shall be made on a form approved by the office. The form shall fully advise the applicant of the nature of the coverage and shall state that the coverage is equal to bodily injury liability limits unless lower limits are requested or the coverage is rejected. The heading of the form shall be in 12-point bold type and shall state: "You are electing not to purchase certain valuable coverage which protects you and your family or you are purchasing uninsured motorist limits less than your bodily injury liability limits when you sign this form. Please read carefully."
§ 627.727(1), Fla. Stat. (2003).
[6] While appellant alleges that two new vehicles were added in 2003, the policy renewals and State Farm's corporate representative's deposition testimony indicate that the number of vehicle exposures increased from three to four in 2003. The number of vehicle exposures increased from two to three in 2001.
[7] Because the 1990 policy "contained Florida policy terms and Florida signatures[,] ... was mailed to Strochak's Florida residence," and "was issued and delivered in Florida," the plurality concluded that it "must presume that the parties to this contract bargained for, or at least expected, Florida law to apply." Strochak v. Fed. Ins. Co., 717 So.2d 453, 455 (Fla. 1998) (citing Sturiano v. Brooks, 523 So.2d 1126, 1130 (Fla. 1988)). The concurring opinion's adoption of this reasoning made this the reasoning of the whole court.
[8] The excess policy at issue in Strochak was initially issued to Donald Strochak, the husband of Rita Strochak (the appellant in that case) in 1985 in New Jersey. Strochak, 717 So.2d at 454. Donald Strochak died in 1987. See id. When he applied for the policy, Mr. Strochak signed a written rejection of excess uninsured motorist coverage. Id. The policy covered, among other things, three motor vehicles, including a 1984 Lincoln which ultimately was involved in the 1992 accident out of which the dispute over uninsured motorist coverage arose. Id. None of these vehicles was registered or principally garaged in Florida at the time the policy issued. Id. In 1989, Rita Strochak registered the 1984 Lincoln in Florida and obtained a primary liability policy on it from the insurer, a policy which was issued and delivered in Florida. Id. In 1989, the insurer mailed a "Masterpiece policy" to Donald Strochak in New Jersey, a policy which replaced the excess policy issued in 1985. Id. In June 1990, the Lincoln, still registered and principally garaged in Florida, was added to the Masterpiece policy; this 1990 policy "contained Florida policy terms and Florida signatures and was mailed to [Rita] Strochak's Florida residence." Id. at 454-55. The policy "contained a different policy number and provided different coverage" from that offered in the 1985 policy. Id. at 455. When the policy was renewed in 1992, it "list[ed] the 1984 Lincoln as garaged in Florida." Id. at 454.

Unlike the excess policy in Strochak, which, when it was issued and delivered in Florida in 1990, was issued to a different named insured than that issued in 1985, had a different policy number from the original 1985 excess policy, and contained different terms from the 1985 policy, the policy at issue here was issued to the same insured and retained the same policy number from 1992 forward. The only changes to the umbrella policy from 1992 through 2004 were the number of underaged drivers covered (and the resulting change from Class I to Class II), the number of automobile exposures, and the annual premiums.
While the facts of Strochak led the supreme court to conclude that the policy issued to Donald Strochak in New Jersey in 1985 was a different policy from the one issued to Rita Strochak in Florida in 1990, the facts here indicate that, despite alterations in the policy, appellant held the same policy from 1992 through 2004. Unlike the excess policy at issue in Strochak, which, at the time of application, issued in New Jersey and covered no vehicles registered or principally garaged in Florida, appellant applied for the umbrella at issue here in Florida, the policy was issued and delivered in Florida in 1992, and all renewal notices were mailed to appellant at his Florida address.
[9] Appellant relies entirely on the absence of certain language in subsection (2) that does appear in 627.727(1), Florida Statutes. Subsection (1) provides that, after an insured has rejected uninsured motorist coverage in writing as contemplated by subsection (1), the insurer need not (absent a written request from the insured for uninsured motorist coverage or for higher uninsured motorist limits) provide an insured another opportunity to reject such coverage in "any other policy which renews, extends, changes, supersedes, or replaces an existing policy." § 627.727(1), Fla. Stat. (Supp.1984).

An earlier version of subsection (1) provided only that the insurer need not provide uninsured motorist coverage previously rejected "in or supplemental to a renewal policy" but did not mention policies which extend, change, supersede, or replace existing policies, § 627.727(1), Fla. Stat. (1979). Case law interpreting that earlier version required an insurer to offer the insured a new opportunity to reject coverage any time the policy underwent a "material change." See U.S. Fid. & Guar. Co. v. Waln, 395 So.2d 1211, 1214 (Fla. 4th DCA 1981) (citing U.S. Fire Ins. Co. v. Van Iderstyne, 347 So.2d 672 (Fla. 4th DCA 1977)); see also Coney v. Gen. Ins. Co., 445 So.2d 671, 672-73 (Fla. 3d DCA 1984) ("Under prior case law, the test for determining whether Section 627.727(1) required an insurance company to afford the insured a new opportunity to reject uninsured motorist coverage was whether the original policy had been changed in any material respect. That determination was necessary because, under the previous version of Section 627.727, a new offer of uninsured motorist coverage was unnecessary only as to renewal policies. Thus, if a policy were materially changed, it was not a renewal policy and the insurer was required to re-offer uninsured motorist protection." (citations and footnote omitted)).